*UNITED STATES DISTRICT COURT*
*DISTRICT OF MAINE*

| | | |
|---|---|---|
| *UNITED STATES OF AMERICA* | ) | |
| | ) | |
| *v.* | ) | *Criminal No. 08-13-P-S* |
| | ) | |
| *STEPHEN ADRIAN RAMNATH,* | ) | |
| | ) | |
| *Defendant* | ) | |
| | ) | |

*RECOMMENDED DECISION ON MOTION TO SUPPRESS*

Stephen Ramnath, charged with conspiracy to distribute and to possess with intent to distribute 50 grams or more of a substance containing cocaine base in violation of 21 U.S.C. §§ 841(a)(1) and 846, Indictment (Docket No. 1), seeks to suppress all evidence gathered as a result of events on August 14 and October 12, 2007 in Prospect Park, New Jersey. An evidentiary hearing was held before me on June 5, 2008 at which the defendant appeared with counsel. Ten exhibits were offered by the government and one by the defendant; all were admitted without objection. Six witnesses testified, including the defendant. I now recommend that the following findings of fact be adopted and that the motion be denied.

**I. Proposed Findings of Fact**

On July 21, 2007, Special Agent Paul Buchanan of the Drug Enforcement Agency's Portland, Maine, office began to monitor a court-authorized wiretap on the telephone of Hussein Al-Rikabi. Buchanan was the lead agent for this investigation. At the time, he had been with the DEA for eight and a half years; before that, he had been with the Immigration and Naturalization Service for eight years. A record of the calls was kept on line sheets, which show the number

assigned to each call, the date and time of the call, the names of the parties to the call (if known), the telephone numbers involved in the call, the language in which the call was conducted, a synopsis of the substance of the call, and the initials of the persons who monitored and summarized the call.  A telephone number to which a Janet Gonzalez subscribed was involved in several calls with Al-Rikabi's telephone number.   The man who was involved in these conversations was later identified as the defendant, Gonzalez's fiancé.   Buchanan became familiar with the voices of Al-Rikabi and the defendant.  He identified the defendant at the hearing.

Government Exhibit 1 is a compact disc containing recordings of the intercepted telephone calls between Al-Rikabi and the defendant that took place between July 26 and July 30, 2007.  Government Exhibit 2 is the call sheets corresponding to those calls.  The calls are a series of conversations in which the defendant arranges to pick up a quantity of crack cocaine for Al-Rikabi.  The defendant was to take money from Al-Rikabi and go into New York City to buy crack cocaine.  Buchanan testified that drug traffickers often use the word "soft" to refer to powder cocaine and "hard" to refer to cocaine base or crack cocaine and that crack cocaine is typically sold to a user in .5 gram or 1 gram quantities.  In the conversations on the disc, the defendant asks Al-Rikabi to pay him $250 to pick up the crack cocaine and mentions the wholesale price in New Jersey of $28 per gram for powder cocaine.  The defendant and Al-Rikabi agree that the defendant will pick up 150 grams of cocaine.  In call number 811, on July 30, 2007, they agree to meet at the train station in 10 to 15 minutes.

Buchanan set up surveillance for this meeting in the Paterson, New Jersey area by telephone with the surveillance team leader.  One team was assigned to the defendant's residence and another to Al-Rikabi's residence.  Both individuals were observed leaving their homes and

followed to the train station.  The defendant was seen inside a Checkers restaurant near the train station, which he left carrying a bag from the restaurant and proceeded to the train station.  Al-Rikabi arrived in his dark Infiniti automobile, parked near the train station, got out and met the defendant at the foot of the stairs to the platform.  The two men got into the Infiniti where Al-Rikabi passed cash to the defendant and the observing officers believed that the defendant gave an unidentified object to Al-Rikabi.  The defendant then got out of the car, went to the train station platform, ate the hamburger he took from the Checkers bag, and then got onto a train.  At that point, the surveillance was ended.

Buchanan checked the National Criminal Information Center data base to determine that the defendant was convicted of robbery and a related gun charge in 1996 and sentenced to 15 years; he was also arrested on an aggravated assault charge in New Jersey in 2006.  He testified that he would not have told the New Jersey agents anything about the defendant before July 20, 2007.  No confidential informant made a controlled buy from the defendant and no undercover officer had any contact with him with respect to the investigation of Al-Rikabi, who was known to bring cocaine from New Jersey into Maine to sell.  The officers were watching Al-Rikabi every day and the defendant occasionally.

Detective Marco Catania, a narcotics detective with the Passaic County Sheriff's Department in New Jersey for the past 3 years, who has 15 years of law enforcement experience, was involved in the joint investigation of Al-Rikabi with the Maine DEA.  He was conducting surveillance on Al-Rikabi's residence on Montclair Avenue in Paterson, New Jersey, on July 30, 2007, and was constantly in contact with one or more agents in Maine by telephone, as well as by radio with other agents conducting surveillance.  He saw the exchange in the Infiniti between

3

Al-Rikabi and the defendant by using binoculars; their interaction was consistent with what Buchanan reported hearing during their telephone conversations that day.

On August 14, 2007, Catania took steps to have the defendant identified by initiating a stop of the defendant.  A marked cruiser was used to stop and identify the defendant after he left his residence.  The defendant was not able to produce valid proof of his identity.  One of the agents called the number involved in the intercepted conversations that had led to the exchange at the train station, and the telephone carried by the defendant rang.  The officers told the defendant that they were looking for a suspect for whom an arrest warrant was outstanding and showed him a photograph.  The defendant was unable to produce any form of identification with a photograph.  He said that he had identification at his residence and a uniformed officer went to the apartment with the defendant, who then produced a passport from Trinidad.  He told the officer that he had had previous encounters with the sheriff's department and should be in its data base.  He was taken back to the department headquarters to confirm his status; when the officers had confirmed the defendant's identity by searching the department's records and verified that there were no outstanding warrants for his arrest, he was transported back to his residence.  Before being taken to the headquarters, the defendant was informed that he was not under arrest but was being detained until the officers could confirm his identity and be sure that he was not wanted for a crime.  He was not handcuffed and was at the headquarters for less than one-half hour.

On October 12, 2007, Catania and two other law enforcement officers, all in plain clothes with their badges displayed on their chests, approached the defendant in front of his residence at 284 North Seventh Street in Prospect Park, New Jersey as he was returning from work at around 3:30 p.m.  Catania advised the defendant that they were detectives from the Sheriff's Department

4

conducting a follow-up investigation with the Maine DEA.  When Catania mentioned Al-Rikabi, the defendant's hands began to shake and his voice broke.  He told the officers that he was aware that Al-Rikabi had been arrested the day before and that he did not want any trouble.  The defendant was cooperative but nervous.  The officers did not handcuff the defendant nor did they draw their guns.  In the course of their conversation, Catania testified, the defendant volunteered that he had a small amount of marijuana in his pocket for his personal use and produced the marijuana.  The defendant was then told that he was under arrest.  Catania testified that he informed the defendant of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), by reading the card that he carries which is printed with the warning.  Government Exhibit 4 is a copy of the card from which Catania read the *Miranda* warning to the defendant.  The defendant said that he understood his rights and did not appear confused nor ask Catania to repeat any of what he had read.  He said that he was willing to cooperate and, according to Catania, offered to allow the officers to search his apartment.  He asked to go up to the apartment to discuss the matter further because his stepdaughter was alone in the apartment and because he did not want his neighbors to know his personal business.  Catania testified that the defendant was not handcuffed at this time because of his cooperative manner.

Just before the officers went upstairs to the apartment with the defendant, a Prospect Park police officer stopped in his marked cruiser and asked if he could be of assistance.  Catania asked this officer to approach the apartment from the back entrance while the detectives escorted the defendant to the apartment through the front door.  Catania testified that the defendant opened the door to the apartment with his key.  The detectives did a quick security sweep of the apartment to be sure that no one else was present, then asked the uniformed officer to stay in the kitchen with the defendant's stepdaughter while they spoke with the defendant in the living

5

room.  The defendant was allowed to smoke at his request.  He told the detectives that there was cocaine in the closet in his bedroom.  The detectives decided that they did not want to leave the defendant's stepdaughter alone when they took the defendant in for booking so they asked either the defendant or his stepdaughter to call the defendant's wife at her place of employment.  She arrived at the apartment within 15 minutes.  She was excited and upset but calmed down after she checked on her daughter in the kitchen and after the detectives told her why they were in the apartment.  She and the defendant had married in August 2007.

Catania testified that he took out the Sheriff's Department's standard written consent to search form and read it to the defendant and his wife, after which they both agreed to sign it. Catania filled in the blanks on the form.  Government Exhibit 5 is a copy of the form that Catania filled out.  It bears Janet Ramnath's signature and the defendant's signature or printed name. Catania testified that, after he read the top part of the form to the defendant and his wife, he asked them if they had any questions and Janet Ramnath asked what would happen if they refused to sign the consent form.  Catania responded that the officers would make an application for a search warrant, which he believed would be granted, and that they would then search the apartment.  According to Catania, Janet Ramnath then told the defendant, "Let's just give them what they want."  They told Catania that they understood the form before they signed it.  The defendant then explained that the cocaine was in a box in the bedroom closet.  According to Catania, the defendant then unlocked a padlock that was on the outside of his bedroom door and pointed to the closet, where the detectives retrieved a box in which they found powder cocaine, marijuana, a digital scale and lactose powder which is used as a cutting agent for cocaine. Government Exhibit 5 lists all of the items taken as evidence.  Based on the defendant's cooperation, the detectives did not search anywhere else in the apartment.

Government Exhibit 6 is a photograph of the box found on the closet floor; Government Exhibit 7 is a photograph of the contents of the box; Government Exhibit 8 is a photograph of a Newport cigarette box which contained marijuana; Government Exhibit 9 is the weight of the powder cocaine found in the box.

The defendant said that there was nothing else in the bedroom.  The detectives then took the defendant out of the apartment to the top of the stairs, where he was handcuffed out of the presence of his stepdaughter.  The detectives told Janet Ramnath that the defendant would be allowed to call her at some later time and that they would stress his cooperation to the magistrate who would set bail.  They then transported the defendant to their headquarters where he was booked.  He was provided with a written *Miranda* warning, which was read to him and which he said that he understood.  He said that he wanted to cooperate and proceed.  Government Exhibit 10 is a copy of the form that was used.  The defendant checked off the box indicating that he understood his rights and both printed and signed his name.  He was then questioned further about his relationship with Al-Rikabi.  He said that he was willing to do whatever he had to do in order to cooperate.

The defendant agreed to give a voluntary statement on video when the detectives suggested it.  The video statement taken that day is Government Exhibit 11.  On the video, the defendant, who is not handcuffed, identifies a photograph of Al-Rikabi as "Hussein," says that he has known Al-Rikabi for about two years, says that "I used to go pick up drugs for Hussein," and says that the exchange at the train station took place during his first trip for Al-Rikabi, who gave him $4,100 while he was in the Infiniti, after which the defendant went into Manhattan and got 100 grams of crack at $29 per gram that he brought back and gave to Al-Rikabi.  The defendant says that he only did this twice, bringing back 100 grams each time.  He says that Al-

Rikabi sells drugs in Maine and that his car has a Maine license plate.  The car is a dark Infiniti Q45 from 1996 or 1997.  He says that he was never asked to do anything for Al-Rikabi other than picking up the drugs those two times.  He says that he is willing to cooperate with agents from Maine, was not pressured into making the statement, and swears to the truth of the statements made.   At the end of the video, the defendant says that he wanted to cooperate in any way that he can to help himself out.  As his questioner leaves the room at the conclusion of questioning but with the tape still running, the defendant says, "Can I say one more thing?  I wish I'd never met that guy."  During the video, Detective Frank Ortisi is seen reading from a paper, which he and Catania said was an outdated form listing questions to be asked at any video statement.

Catania's written report about the events of July 30, 2007 does not mention that he had or used binoculars.  His report dated October 12, 2007 says that the Maine DEA agents had identified the defendant, although only as "Steve," by July 15, 2007.[1]  On September 13, 2007, while he was doing mobile surveillance on Al-Rikabi, Catania saw him pick up the defendant and drive him to his apartment, where the defendant went inside, came right back and exchanged a small object for currency through the passenger side window of Al-Rikabi's car.  Catania testified that, on October 12, 2007, one police vehicle may have blocked the van in which the defendant was driven home until one of the detectives had made sure that the driver was not involved in the matter at hand.

On October 12, 2007, the *Miranda* waiver form was signed at the sheriff's department at 4:42 p.m.  Catania checked the box on the form for written but not for oral warnings because a written warning was given at that time.  He did not mean to suggest that no oral warning had been given earlier.

---

[1] The report was not offered in evidence.

8

Detective Ortisi has been with the Passaic County Sheriff's Department in New Jersey for 18 years.  He participated in the investigation of Al-Rikabi and in the surveillance on July 30, 2007.  He also approached the defendant on October 12 with Detective Catania.  He testified that when the defendant was asked whether he had anything on his person that the detectives should know about, the defendant said that he had marijuana and took it out of his pants pocket.  He saw Catania take out his *Miranda* card and read it to the defendant.  The defendant indicated that he understood his rights and wanted to waive them and cooperate.   Ortisi's testimony was essentially the same as Catania's, with the following exception:  The defendant at first was "not keen on the idea" of giving the detectives permission to search his apartment, but his wife encouraged him to consent and he agreed within a few minutes.  Ortisi testified that the form from which he read during the video statement was an old form of questions that New Jersey used to require for such statements, and he just read from it for his own convenience.  The time stamp at the start of the video is 7:20 p.m.

The testimony of the defendant, his wife, and his stepdaughter differed dramatically from that of the special agent and detectives.  Janet Ramnath testified that in order to reach their second-floor apartment it was necessary to go through two doors and that the defendant had no key for the second door, so he had to get into the apartment through the back door.  She testified that there is a lock on her bedroom door but denied that it is a padlock.  At first she testified that, while the bedroom door could be locked and unlocked with a key on the outside, it was only locked for privacy when she and her husband were inside the room.  After cross-examination on this point, she eventually testified that she always kept the door locked, even when she was not in the bedroom, in order to keep her daughter, Katelin, out of the room.  She was called by her

daughter around 3 p.m. on October 12, 2007; her daughter was crying and said that she needed to come home right away because "the cops" were in their apartment.

When she arrived at the apartment, she went to the kitchen to check on Katelin and then went into the living room and sat next to her handcuffed husband.  According to Janet, Detective Nelson Tejada "did all the talking," introduced himself and the others to her, told her that everything was going to be fine, and told her that he needed to search the apartment.  She said Tejada told her that there were two ways they could do this: she and her husband could sign the consent form willingly and if not he would call and get a search warrant and also call DYFS.[2] She knew that DYFS could remove parents' children.  After that, she signed the consent to search form (Government Exhibit 5) and, at the time that she signed, the line where her husband's name now appears was blank,[3] along with every other line that is now filled in on the form.  She testified that Tejada did not explain why he was asking for her consent to search the apartment and that no one ever read the form to her.  She also testified that the block printing of her husband's name on the form is not his signature; his signature does appear on the *Miranda* waiver form (Government Exhibit 10).

Janet testified that no one brought a box into the living room while she was present and that the officers took the defendant away about 1½ hours after she arrived.  On cross-examination, she first denied that she had a criminal record but eventually admitted that she had been convicted of shoplifting in 1994.  She is aware of the mandatory minimum 10-year sentence for the charge against the defendant and that he will be deported if he is convicted.  She testified

---

[2] At the hearing, no one seemed sure what the letters in this state-agency acronym stand for.  The acronym was pronounced "DYE-fus," in apparent reference to the Division of Youth and Family Services within the New Jersey Department of Children and Families.  *See* www.state.nj.us/dcf/divisions/dfys/index.html.
[3] This testimony is inconsistent with the placement of Janet Ramnath's signature on the form.  It appears below the line denoted "SIGNATURE:" after which space is provided for only one signature.  Govt. Exh. 5.  If Janet Ramnath signed the form before that space was filled in, she would logically have put her signature in the space so denoted.

that she was unaware of any cocaine in the bedroom closet and would not have allowed it to be kept there.  She never saw the cocaine and did not know where the box came from; she had never seen the box in her closet, which was so small that she would have noticed the box on the floor immediately.  She testified that Tejada told her that they had found marijuana in the defendant's pocket.  She knows that he smokes it, but she does not allow it in the apartment.

Katelin Gonzalez, who is 14 years old, testified that she was in the apartment at 3 p.m. on October 12, 2007 either because it was a weekend or she had a day off from school for Halloween.[4]  She heard a knock on the apartment door and heard the defendant asking her to open it, so she opened the door and saw "a cop" standing beside the handcuffed defendant and "two more cops" behind him.  The officers came in and sat the defendant on the couch in the living room.  She then heard knocking at the back door and an officer told her to open that door.  When she did, she "saw a gun in [her] face."  The police officer holding the gun put it away and four more officers came through the back door and immediately searched all of the rooms in the apartment.  She stayed in the kitchen with an officer from Prospect Park but she could see two officers searching the closet and dresser in her bedroom.  She heard the defendant say, "Why am I in handcuffs?" in a conversational tone just after he came into the apartment.  One of the officers told her to call her mother.  She has no idea how long the officers were in the apartment.

The defendant testified that his employer, Mr. Zulli, drove him home from work on October 12, 2007.  As the defendant got out of Zulli's van, Ortisi pulled up in a navy Odyssey, Tejada pulled up in a beige Explorer, Catania pulled up in a blue Nissan, and they all blocked the van.  All three ran to him and grabbed him and told him, "You're arrested; your boy Al-Rikabi has been locked up."   He testified that there were at least 8 officers and 4 law enforcement

---

[4] October 12, 2007 was a Friday.  I am unaware of any school system that gives students a day off for Halloween, let alone 19 days before the event.

vehicles around the van.  The officers patted him down, took his cell phone and put him in the Explorer.  The officers took Zulli's license but let him leave after 10 to 15 minutes.  The defendant denied being read his *Miranda* rights outside the house; he said "I didn't even know what a *Miranda* right was until I went into the county jail."  He said that Tejada then took the defendant's keys, saying, "We know what you got in the house."  The defendant testified that he kept saying, "Why are you violating my rights?  I haven't done anything."

According to the defendant, Tejada then grabbed him by the back of his neck and walked him into the house, using the defendant's keys to unlock the doors.  He was unable to open the apartment door because the defendant's key was broken, so he knocked and Katelin opened the door.  He testified that he never gave consent to enter or to search the apartment and that he was never asked for his consent for either action.  He said that Catania found marijuana in his pants pocket when he patted him down outside the house; he denied that there was any marijuana in the cigarette pack in the box in the closet.  He testified that Catania never showed him the card printed with the *Miranda* rights and never read it to him; he never signed or printed his name on the consent to search form, nor was he asked to do so.  Government Exhibit 10 does bear his signature; when he signed that *Miranda* form, he learned for the first time what his *Miranda* rights were.

The defendant also testified that Catania said that the defendant's wife should be called after the defendant told him that his wife's name was on the bills.  He said that he was handcuffed the whole time he was in the apartment with the officers.  He testified that after his wife arrived and calmed down, Tejada talked with her.  He said that when his wife signed the consent form, it was blank; he would not sign it.  He said that an officer whom he did not name told his wife that if she did not sign the blank consent form, they would lock her up and DYFS

would take her children.  He testified that he told the officers "from the start" not to go into his apartment, that he did not tell them that there were drugs in the bedroom, and that they told him that, if he gave them information about "somebody bigger," they would pay him for that information. The defendant testified that when, inside the apartment, he asked why he was in handcuffs, he was yelling and that he kept asking why the officers were violating his rights.

The defendant went on to say that during the 20-25 minute trip to the sheriff's headquarters, Ortisi kept telling him that he had to help himself "because this is a federal investigation," and that Ortisi "was basically coercing me," so he told Ortisi, "All right, I'll tell you what you want to know."  Later, inside the headquarters, when Catania showed him the *Miranda* rights waiver form, he understood for the first time what his rights were and realized that "I shouldn't have talked to them."  The officers took turns asking him questions throughout the time he was at the headquarters; he said that there were "so many officers."  He testified that the paper Ortisi consulted during the video statement "had all the questions he was going to ask" and that before the video statement was taken, the officers had coached him "off the paper" on the answers he should give to those questions.  He said that during the video statement he occasionally forgot what he was supposed to say in response to a question and then Ortisi "was suggesting" the appropriate answers by looking at him "hard" and thereby telling him that he had to say "Yes."  He testified that he made the last remark recorded on the video, after Ortisi had left the room, because Ortisi had told him to say that then.  "They" told him to say that Hussein paid him $500 each time he bought drugs for Hussein.

The defendant testified that from the time he returned to his apartment, which he now said was at 2:50 p.m. while when he began his testimony he said was at 3:20 p.m., to nearly 9:00 p.m., the officers were talking with him.  Other than the video statement, none of these

conversations was recorded.  The defendant testified that "they" told him that they just wanted Hussein and would let him go on a very low bail if he "did the right thing," but when they arrived at the county jail "they" had an immigration retainer on him so they just pushed him inside and left.

On cross-examination, the defendant said that he believes that he will be deported automatically if he is convicted on this charge.  He has lived in the United States since he was 12 years old.  He would be deported to Trinidad.  He agreed that he had been through the criminal justice system before on charges of robbery and possession of a firearm without a permit on which he was convicted and sentenced to 15 years.  He stated that he knew his rights in connection with being arrested but had never known that those rights were called *Miranda* rights. He said that, if he had been read his rights in the apartment, he would have stayed quiet, but "once they started threatening my family" Ortisi told him to cooperate and everything would be all right.  He testified that the cocaine and marijuana found in the apartment were his, that he used the digital scale to weigh out his marijuana, and the lactose powder to mix his cocaine outside the apartment.  He denied that the bedroom door was padlocked and said that the lock was just a deadbolt with a key to use on the outside.

The defendant said that he was never read his *Miranda* rights on October 12 and just signed the waiver form without reading it.  He said that he appears cooperative on the video statement because Ortisi told him to be as cooperative as possible and "he was forcing me to say what I did."  He asserted that he did not understand his *Miranda* rights at the time.  He acknowledged that the telephone conversations on Government Exhibit 1 were conversations between him and Al-Rikabi.  He testified that he did not sign the consent to search form (Government Exhibit 5) and now said that he did not see his wife sign the form but also said that

14

the signature on the form appeared to be hers.  He denied that the printed version of his name on Government Exhibit 10 had been printed by him.

## II.  Discussion

Arguing orally at the close of the hearing, counsel for the defendant identified three issues to be resolved by the court: whether the encounter on August 14, 2007 was an unlawful arrest; whether the law enforcement officers ever had consent to search the apartment on October 12, 2007; and whether the defendant's arrest on October 12, 2007 was justified.  He also contended that no *Miranda* warning was given to the defendant until he arrived at the sheriff's headquarters on October 12.  The defendant does not appear to challenge the initial stop on October 12, perhaps because he takes the position that he was arrested immediately when the officers first approached him that day.

### A.  August 14, 2007

The government points out that the motion to suppress "only discusses statements made by the defendant on the day of his arrest[]" and does not refer to any statements he may have made on August 14, 2007, when the defendant was stopped.  Government's Objection to Defendant's Motion to Suppress Evidence ("Opposition") (Docket No. 36) at 5 n.2.  However, I take the oral argument of defense counsel to be twofold: that the stop of the defendant was an unlawful arrest and, as the only source of the defendant's identity, taints any further evidence law enforcement may have obtained, and that the stop was the start of a course of unlawful conduct, that is, that the circumstances of the stop make it more likely that the officers' actions on October 12, 2007 were also unlawful.  The only "evidence" that the defendant apparently seeks to suppress in connection with the August incident is his last name, because the officers

already had his address, the location of the telephone he had been using to talk with Al-Rikabi, and his first name.  The defendant offered no evidence at hearing about the events of August 14.

The government contends that the defendant was not in custody on August 14, Opposition at 5 n.2, but its proffered witnesses agreed that, when the officers decided to take him to the sheriff's headquarters in order to confirm his identity, the defendant was not free to leave. *See United States v. Tyler*, 512 F.3d 405, 409-10 (7th Cir. 2008) (seizure found under similar circumstances). The officers certainly had sufficient reason to stop the defendant that day under the terms of *Terry v. Ohio*, 392 U.S. 1, 22-26 (1968).  "It is well-settled that, based merely on reasonable and articulable suspicion, a police officer may make a brief stop or 'seizure' of an individual to investigate suspected past or present criminal activity." *United States v. Diaz*, 519 F.3d 56, 61 (1st Cir. 2008) (citation and initial punctuation omitted).  They knew that a man named Steve had talked with Al-Rikabi using a telephone at the address from which the defendant emerged when he went to meet Al-Rikabi at the train station.  They also knew that arrangements made by Steve and Al-Rikabi in several intercepted telephone conversations appeared to concern cocaine.  On August 14, the defendant again emerged from the same address.  This gave the officers, who testified that they wanted to obtain information identifying the defendant, something well beyond a reasonable suspicion that the defendant was involved in criminal activity.

But it is the officers' actions after the stop that the defendant finds objectionable.  An officer's actions after a justifiable investigatory stop "must be responsive to the emerging tableau – the circumstances originally warranting the stop, informed by what occurred, and what the officer learned, as the stop progressed." *United States v. Taylor*, 511 F.3d 87, 90 (1st Cir. 2007) (citation omitted).  Here, the defendant told the officers that his name was Stephen Ramnath,

making it very likely that he was the person who had spoken with Al-Rikabi, rather than a third person sent from his address to meet with Al-Rikabi, and he could not produce any identification documents.   At this point, the officers' seizure of the defendant was justified, as the facts available to the officers at the moment of the seizure warranted a person of reasonable caution in the belief that the action taken was appropriate, *United States v. Blackman,* 66 F.3d 1572, 1576 (11th Cir. 1995).   The officers detained the defendant in order to pursue a method of investigation that was likely to confirm or dispel their suspicions quickly and with a minimum of interference.   *United States v. Gil*, 204 F.3d 1347, 1351 (11th Cir. 2000); *see also McHenry v. County of Delaware*, 2005 WL 2789182 (E.D.Pa. Oct. 24, 2005), at *9 n.8 (brief trip to state police barracks to determine identity does not amount to constitutional violation).

Even if the seizure was not justified, the officers gained nothing from the seizure, so far as the evidence shows, beyond the defendant's last name, the fact that he had encountered the Passaic County Sheriff's Department on a prior occasion, and the fact that he was not a United States citizen.   None of this is incriminating information, and none of this information was shown at the hearing to have contributed to the defendant's subsequent arrest in any way.   The officers would have stopped the defendant outside his residence on October 12 whether or not they knew his last name or his nationality.   There is no evidence about the nature of the defendant's prior contact with the sheriff's department.   There has been no showing that this information was requested for some purpose other than record-keeping.   *See Pennsylvania v. Muniz*, 496 U.S. 582, 601-02 (1990).   Under these circumstances, there is nothing to suppress and the incident cannot be said to be "of a pattern with" the October 12 arrest or otherwise to make it more likely that the October 12 arrest was illegal.

### B.  The events of October 12, 2007

At the close of the hearing, defense counsel argued that the arrest of the defendant on October 12, 2007 occurred immediately upon the arrival of the officers when the defendant returned from work and was not justified; that the defendant was not given any *Miranda* warning until he arrived at the sheriff's headquarters; and that the defendant never consented to the search of his apartment and his wife's consent, both because it was obtained only after the defendant refused consent and because she was coerced into giving consent, was not voluntary.

With respect to the first argument, defense counsel asserted that the officers already thought that the defendant had sold 150 grams of crack cocaine to Al-Rikabi and Al-Rikabi had been arrested the previous day, so the officers must have gone to the defendant's residence to arrest him, and the story about the marijuana is pretextual.  However, the defendant himself testified that he had marijuana in his pants pocket that day and that Catania found it there when he patted the defendant down outside the house.  The defendant has offered no evidence or legal argument that he could not have been arrested for possession of the marijuana that was found on his person that day.  Thus, the arrest, if it occurred after the marijuana was found, clearly was justified.  *See Beck v. Ohio*, 379 U.S. 89, 91 (1964).

In this regard, I find the officers' testimony that the defendant informed them of the presence and location of the marijuana after being asked by the officers if he had anything on his person that they should know about and before being arrested more credible than the defendant's testimony that the officers grabbed him immediately after getting out of their vehicles and told him that he was being arrested.  In addition, the officers most likely did have probable cause at that moment to arrest the defendant based on their knowledge of his involvement with Al-Rikabi.

Thus, it makes little sense that they would fabricate an arrest for marijuana possession.  I conclude that the arrest of the defendant on October 12, 2007 was not unjustified or otherwise illegal.

As to the issue of the *Miranda* warnings, I credit the testimony of the officers rather than the shifting testimony of the defendant where the two conflict.  I find the idea that experienced law enforcement officers would not provide at least oral *Miranda* warnings at the time of an arrest highly unlikely.  With respect to what according to the officers was the second *Miranda* warning that day, the waiver form that the defendant admits he signed at the sheriff's headquarters is in evidence.  Government Exhibit 10.  The defendant testified that he did not read the form before signing it, but he did not testify that the officers in any way prevented him from reading it.  He also testified that when he saw this form, he understood for the first time what his rights were, something he could not have achieved without reading the form, because he testified that no one had informed him of his rights orally.  In any event, I conclude that any statements made by the defendant to the officers on October 12 were made with the required knowledge of his rights and after an oral or written waiver of those rights.

To the extent that the defendant means to argue that his statements that day were not voluntary because they were coerced, Motion to Suppress Tangible and Derivative Evidence and Statements, Admissions, and Confessions ("Motion") (Docket No. 42) at 2, 4-5, his testimony is the only evidence.  His testimony in this regard was that Ortisi "was basically coercing" him by telling him that he had to help himself because he was involved in a federal investigation, that "once they started threatening my family Ortisi told me to cooperate and everything would be all right," that Ortisi was forcing him to say what he said in the video statement, and that he was forced to say that he understood that no one could force him to make a statement.  Beyond the

fact that some of these assertions are conclusions unsupported by any specific factual assertions as to the nature of the alleged coercion, the only evidence of a threat to the defendant's family was provided by Janet Ramnath, who testified that Tejada told her that if she and the defendant did not sign the consent to search, he would call DYFS.  There is no evidence linking any of the defendant's statements to this alleged threat.  The defendant's behavior during the video statement is not that of a cowed man desperate to save his family.  He was familiar with the criminal justice system.  He did not testify about the extent of his education, but he was articulate.  *See Fare v. Michael C.*, 442 U.S. 707, 724-27 (1979).  Nothing in the record of this case other than the defendant's conclusory statements provides any evidence that his will was overborne with respect to his waiver of his *Miranda* rights, *see United States v. Vega-Figueroa*, 234 F.3d 744, 749-50 (1st Cir. 2000), and those assertions are not enough to require suppression of any statements he may have made on October 12.

On the question of consent to search the apartment, some of the evidence is troubling.  Catania testified that, while they were all still outside the house, the defendant spontaneously offered to let the officers search his apartment.  Ortisi, however, testified that the defendant, once in his living room, was reluctant to allow the officers to search and only consented after his wife urged him to do so.  In addition, the defendant's name appears on the consent form in at least partial block printing; a comparison of the *Miranda* waiver, which unquestionably contains his signature, reveals two different signatures perhaps but not necessarily explained by the partial block printing on the consent form.  Counsel for the defendant, in his oral argument, invited the court to compare the printing of the defendant's name on the consent form (Govt. Exh. 5) with the printing of the list of evidence taken from the apartment that appears at the bottom of the form, but the court has no independent expertise in handwriting analysis.  It cannot draw defense

20

counsel's desired conclusion that both were written by Catania, who testified that he wrote the list, in the absence of expert testimony to that effect.

Catania testified that the defendant offered to let the officers search his apartment while they all were still outside.  Ortisi did not confirm this.  Both testified, however, that the defendant, after he was arrested, asked that everyone go into his apartment, either to avoid providing his neighbors with information about his personal business or out of concern for his stepdaughter, who was alone in the apartment.  I credit this testimony over that of the defendant, who said that he never consented to the officers' entry into the apartment and was never asked for such consent, the latter being carefully worded testimony that is not necessarily inconsistent with that of the officers.  This version of events is also consistent with Katelin Gonzalez' testimony that when she heard knocking at the front door of the apartment, she also heard the defendant asking her to open the door.  The defendant was not likely to assist the officers in gaining entry to his apartment if he had communicated in any way to the officers his refusal to consent to that entry.

Counsel for the defendant argued at the close of the hearing that the officers called Janet Ramnath to the apartment in order to obtain consent to search because the defendant would not give it to them.  He correctly asserted that case law prevents this stratagem.  *Georgia v. Randolph*, 547 U.S. 103, 106 (2006).  The problem with the argument, however, is that it is not supported by the evidence.  The defendant's only testimony on this issue was that he was never asked for consent to search the apartment and never gave consent to such a search; he even testified that he was never asked to sign the consent to search form, although he also testified that the form was presented to him while he was in the apartment.  He also testified that Catania told someone to call his wife after the defendant said that her name was on the bills.  I do not credit

the latter assertion, which appears to me to have been offered merely to buttress the argument that the officers decided to use his wife to perform an end run around the defendant's refusal to consent.  Even if all of this testimony were credited, however, the fact remains that the defendant did not testify that Catania directed someone to call his wife only after he had himself specifically and unmistakably refused to provide consent to search the apartment.   Certainly neither Catania nor Ortisi so testified.

Even if the defendant did not sign the consent to search form, Janet Ramnath did, and it is clear that she had the authority to permit a search of the apartment.  *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990) (defendant's cotenant with common authority may give consent to search premises).  The issue thus becomes Janet Ramnath's testimony that she was coerced into signing the form by Tejada's threat to call DYFS (or "Social Service") if she did not.  She testified that Tejada asked for her consent to search the apartment.  She testified that no one told her whether the defendant had agreed to allow the officers to search.  She testified that after Tejada told her that the officers needed to do a search, that "it was something they needed to do," she said, "OK."  It was only after this, according to Janet Ramnath,[5] that Tejada told her, "There's two ways to do it.  One, if [you] sign willingly, [we] will search [your] house and everything will be OK; if [you] don't sign it, I will make a phone call, [I] will get a search warrant and [you] will be called [by] Social Service."  According to Janet Ramnath, this meant that the officers would call DYFS, and she knew that DYFS could come in and remove her children.

The problem with this testimony for the defendant's motion to suppress is that, according to Janet Ramnath, she had already given verbal consent to search the apartment before Tejada made the alleged threat.  The alleged threat was not needed because Janet Ramnath had already

---

[5] The defendant testified that the officers told his wife that, if she did not sign the consent form, they would "lock her up, they are going to lock me up, and DYFS would take the kids."  I find this version less credible than that presented by Janet Ramnath herself.

given verbal consent.  She did not say that she subsequently withdrew that consent before Tejada allegedly threatened her.  I do not find the testimony about the alleged DYFS threat to be credible.

If, as Janet Ramnath also testified, she knew nothing about the presence of any marijuana or cocaine in the apartment, her willingness to give written consent to the search makes sense.  I do not credit the suggestion presented by her further testimony that the officers must have planted the box in which the marijuana, cocaine, and digital scale were found because she had never seen the box in her small bedroom closet.  The defendant himself testified that he used the digital scale to weigh his marijuana.

Both Catania and Ortisi testified that Janet Ramnath asked what would happen if she refused to consent to the search and that she was told that the officers would apply for a search warrant and believed that they would obtain one.  This is a statement of fact and not inherently coercive.  On the showing made, I conclude that Janet Ramnath signed Government Exhibit 5 voluntarily.  The ensuing search accordingly was not objectionable.

### III.  Conclusion

For the forgoing reasons, I recommend that the proposed findings of fact herein be adopted and that the defendant's motion to suppress be **DENIED**.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within ten (10) days after being served with a copy thereof.  A responsive memorandum shall be filed within ten (10) days after the filing of the objection.*

***Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.***

Dated this 8th day of July, 2008.

/s/  John H. Rich III
John H. Rich III
United States Magistrate Judge